# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### August 11, 2021 Session

## STATE OF TENNESSEE v. JALEAN ROBERT WILLIAMS AND MARKEIL LINSKEY WILLIAMS

**Appeal from the Criminal Court for Davidson County**
**No. 2017-A-296      Cheryl A. Blackburn, Judge**

_____

### No. M2019-02307-CCA-R3-CD

_____

After a jury trial and subsequent retrial on two of the charges, the defendants, Jalean Robert Williams and Markeil Linskey Williams,[1] were convicted of first-degree premeditated murder, felony murder, possession of marijuana with intent to sell or deliver, possession of Alprazolam with intent to sell or deliver, and two counts of possession of a firearm during the commission of a dangerous felony. The trial court imposed an effective sentence of life imprisonment plus fourteen years on each defendant. On appeal, both defendants assert the evidence is insufficient to sustain their convictions. In addition, Defendant Markeil argues the trial court erred in allowing the State to ask leading questions, and the trial court's imposition of consecutive sentences violates the prohibition against double jeopardy. Upon our review of the record and the applicable law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

J. Ross Dyer, J., delivered the opinion of the court, in which James Curwood Witt, Jr. and Camille R. McMullen, JJ., joined.

Jay A. Umerley, Nashville, Tennessee (on appeal) and Jack Byrd, Nashville, Tennessee (at trial), for the appellant, Jalean Robert Williams.

David A. Collins, Nashville, Tennessee (at trial and on appeal), for the appellant, Markeil Linskey Williams.

---

[1] Because the defendants share the same surname, we will refer to them by first name for clarity. We mean no disrespect by this practice.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Megan King and Doug Thurman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

This case arises out of the shooting death of the victim, Kevin Ibarra, during an apparent drug deal or robbery gone bad. Brothers and co-defendants, Jalean and Markeil Williams, were indicted for first-degree premeditated murder (Count 1), felony murder (Count 2), possession of marijuana with intent to sell or deliver (Count 3), possession of Alprazolam with intent to sell or deliver (Count 5), two counts of possession of a firearm during the commission of a dangerous felony corresponding to each of the two drug charges (Counts 4 and 6), and unlawful possession of a weapon (Count 8). Defendant Jalean was additionally charged with evading arrest (Count 9). Another co-defendant, Shirin Khwaga, was also charged with the above offenses, including evading arrest (Count 7), but her case was severed from the co-defendants, and she was a witness for the State. The case against the co-defendants proceeded to trial on Counts 1-6 because Counts 8 and 9 were dismissed, and only Ms. Khwaga had been charged in Count 7.

At the first trial, the jury returned a partial verdict finding both defendants guilty on the drugs and weapons charges in Counts 3-6. The jury, however, was unable to reach a verdict on the murder charges in Counts 1 and 2. The trial court declared a mistrial on the murder charges, but, after a second trial with the same witnesses, the jury found both defendants guilty on the murder charges. Following a sentencing hearing, the trial court imposed on both defendants mandatory life sentences for the murder convictions, which merged, and an effective consecutive sentence of fourteen years for the other convictions.

The witnesses' testimony at the two trials was essentially the same; therefore, we summarize the testimony in tandem.

Shirin Khwaga acknowledged that she was charged along with the defendants and that her case was still pending. She had not been promised anything in exchange for her testimony but was hoping she would receive some leniency if she testified truthfully. Ms. Khwaga said she had been in an intimate relationship with Defendant Markeil for three or four weeks at the time of the crime, but she had known both defendants for years. She recalled Defendant Markeil's nickname was "Flocka," and Defendant Jalean's nicknames were "JJ" and "Lul Rambo." Ms. Khwaga moved in with the defendants about two weeks

before the incident because she had been kicked out of her parents' house because her mother did not approve of her relationship with the defendants.

Ms. Khwaga testified that around noon on September 4, 2015, she and the defendants went to the victim's home to buy Xanax. She had a blue cast on her left arm at the time. She said all three of them wanted to buy Xanax, but it was Defendant Jalean's idea to buy it from the victim. Defendant Jalean directed her to the victim's house as she drove them in her "silver, tannish" four-door Honda Civic with a temporary tag in the back window. Ms. Khwaga recalled both defendants were armed with handguns.

The group alerted the victim when they arrived at his house but, before the victim got into Ms. Khwaga's car, Defendant Jalean instructed Defendant Markeil to pretend to be asleep. Ms. Khwaga was in the driver's seat, Defendant Markeil was in the front passenger seat, Defendant Jalean was in the back seat behind his brother, and the victim got into the back seat behind Ms. Khwaga. The victim and Defendant Jalean discussed Defendant Jalean's desire to purchase drugs from the victim. During their interaction, Defendant Jalean and the victim showed each other their guns but not in a threatening manner.

According to Ms. Khwaga, the victim asked Defendant Jalean if he had money for the drugs he wished to purchase and asked to see it. After Defendant Jalean showed the victim some money, the two men got out of the car to go inside the victim's house. Defendant Jalean grabbed one of Ms. Khwaga's socks, a "colorful sock with polka dots," from her backpack before heading inside, which he later brought out full of pills. Defendant Markeil entered the victim's home about three or four minutes after the victim and Defendant Jalean. After five to seven minutes, Ms. Khwaga, who had been waiting in the car, heard four to six gunshots. She recalled hearing a pause between the series of shots. Ms. Khwaga panicked and ran into the house. The home alarm was sounding, and she started yelling.

Ms. Khwaga testified that Defendant Markeil came down the stairs and asked why she was in the house. He told her not to touch anything and ran back upstairs. Ms. Khwaga walked toward the kitchen and had "barely made it there" when she saw the victim's body. She "freaked out" and yelled she was leaving "with or without them." By the time she turned around to leave, Defendant Jalean was standing at the bottom of the stairs and then Defendant Markeil ran down and followed him out. Ms. Khwaga did not see anyone else inside the victim's home.

The three of them returned to the car, and Ms. Khwaga drove away. However, as she was leaving the neighborhood, the defendants realized they forgot something and insisted she drive back to the victim's house. She initially replied there was "no way" she

was going back, but she nevertheless turned around, stopped at a stop sign near the victim's house, and told them to get out of the car there. The defendants ran back to the victim's house, while Ms. Khwaga turned her car around and pulled in front of the victim's house. She yelled to the defendants to hurry, and they emerged about a minute later. When they did, Defendant Jalean was carrying two, eight-inch plastic containers of marijuana, and Defendant Markeil was carrying a gray and black rifle.

Ms. Khwaga asked the defendants why they killed the victim, and "they were just saying that they had to do it, and [Defendant Jalean] said if he didn't, [the victim] would have retaliated." Neither defendant appeared upset, sad, nervous or scared, and neither indicated the victim had threatened or pulled a gun on them. Ms. Khwaga said she took the defendants back to the victim's house the second time because she was "scared" and had not "processed anything at the time." She did not call the police for the same reasons. She maintained she did not go with the defendants to the victim's home that day knowing they would rob and kill him. Ms. Khwaga said that although she had used Xanax, cocaine, and marijuana that day, she had a clear recollection of what occurred.

Ms. Khwaga testified the three of them immediately began "popping Xanax and getting high" as they fled the victim's home the second time. She drove to Antioch High School to pick up a student in whom Defendant Jalean was interested, and then went to a nearby lake where the group smoked marijuana.[2] Defendant Markeil had passed out by that time and did not partake. After reading on her Facebook newsfeed that the police were on the lookout for her vehicle, Ms. Khwaga went to her parents' house to gather some belongings because Defendant Jalean told her she had to leave town otherwise she would "spend the rest of [her] life in the penitentiary." Defendant Markeil was still passed out in the car.

Ms. Khwaga parked down the street from her parents' house so as not to be seen, ran inside, and packed a backpack of clothes. She threw the backpack in the trunk and drove off. Ms. Khwaga said she took back roads to avoid detection but nevertheless encountered a police car. Instead of stopping, she "took off" and was soon pursued by a number of police cars. Ms. Khwaga crashed into a pole after she took a sharp left and hit the brakes. Ms. Khwaga remained in the car, surrounded by police, but Defendant Jalean grabbed "some guns or whatever was in the back seat" and ran.

Ms. Khwaga admitted she was not completely honest with the police in the statement she gave the day of her arrest because she was terrified and intoxicated.

---

[2] Defendant Jalean asserts in his brief that Ms. Khwaga only testified about picking up the unidentified student in the second trial and not in the first trial, "directly contradict[ing] her original testimony and compromis[ing] her entire testimony." However, our review of the record dispels this assertion as Ms. Khwaga did in fact testify about picking up the student at both trials.

Additionally, in a statement she gave on October 1, 2015, she was more truthful but did not admit to entering the victim's house because she wanted to distance herself from what had happened and was still fearful. She was still in contact with Defendant Markeil and his family at the time. Ms. Khwaga maintained she was finally completely honest in an interview on November 22, 2017, and her testimony at trial was consistent with that interview. She said her trial testimony was also consistent with testimony she gave in another court proceeding on April 17, 2018. She averred she was being 100 percent honest about the events of September 4, 2015.

Ms. Khwaga identified photographs of her car at the crime scene. She also identified photographs of a gun, marijuana, and Xanax and Lortab pills found in her car that were not in her car prior to the homicide. Ms. Khwaga said neither defendant had a job, and she had witnessed Defendant Markeil sell Xanax, cocaine, and marijuana. She saw him sell cocaine and Xanax to someone the night before the crimes. She had also witnessed Defendant Jalean selling "[m]ainly marijuana."

Ms. Khwaga testified Defendant Jalean had a Snapchat account under the nickname, "Lul Rambo," and she explained how Snapchat worked. Ms. Khwaga identified a video of the defendants posted on Defendant Jalean's Snapchat account sometime after the homicide. She knew the video was posted after the homicide because the red and black rifle taken from the victim's home was in the video. She also identified several screenshots of the video. In one screenshot, several Xanax bars can be seen with the caption, "Who needs the real deal bars." In another screenshot, Defendant Markeil is holding a black and red rifle with the caption, "Riding with three Glocks and an AK." Ms. Khwaga believed it was the same rifle she saw Defendant Markeil carry from the victim's house. She recognized Defendant Markeil from his dreadlocks. In another screenshot, Ms. Khwaga recognized Defendant Jalean with "all the guns" in the back seat of her car along with the caption, "[W]ho wants beef? I'll light your whole block." Defendant Jalean's Snapchat video was played for the jury.

Sarai Ibarra Ruiz, the victim's mother, testified through an interpreter that on the morning of September 4, 2015, she gave the victim $1600-$1700 in cash to help with the down payment on a car. The victim needed $3000 for the down payment and had saved up the rest. Ms. Ruiz watched as the victim counted out the money that morning and confirmed he had $3000 with her contribution.

Ms. Ruiz recalled being in the victim's bedroom that morning and noticed a Mary Kay bag that belonged to her. She thought it was odd for her Mary Kay bag to be in the victim's room, so she asked about it and saw two Tupperware containers with what appeared to be bags of marijuana inside the containers.

Around 8:00 a.m., Ms. Ruiz and the victim went to the car dealership, and the victim put down $300 to hold a car until he could return with his girlfriend around noon. He kept the remaining $2700 in his wallet. During their drive home, the victim received a phone call, and Ms. Ruiz heard him tell the caller, "I'm not home, I'll be there in about fifteen minutes." They arrived home around 11:20 or 11:30 a.m., and the victim went to his room and Ms. Ruiz got ready for work. Ms. Ruiz left for work at 11:55 a.m., and she recalled seeing a gray or silver car "driving too fast" and fail to stop at a stop sign as she was leaving her neighborhood. She tried calling her son at 12:15 p.m. while she drove to work, but he did not answer his phone. She then called Jessica Silva, the victim's girlfriend, who told her not to worry because she was outside their house waiting on the victim.

Ms. Ruiz testified she received a call at work from her husband around 1:00 p.m., informing her that "somebody broke in the house to rob, and [the victim] is dead." Ms. Ruiz rushed home and when she was eventually allowed inside, she went into the victim's room and noticed "his room was like all upside down" and things were missing. In particular, she observed the victim's wallet, shoes, True Religion brand clothing, and Michael Kors watch, as well as her Mary Kay bag with the two Tupperware containers was missing.

Ms. Ruiz testified that she knew the defendants and that the victim considered them his friends. Defendant Jalean spent time at their house, and he and the victim borrowed clothing from one another. She never saw Defendant Markeil inside their home, but she saw him outside their home on three or four occasions. Ms. Ruiz did not know Shirin Khwaga.

Ms. Ruiz examined several photographs, including one in which Defendant Jalean was wearing the belt and pants the victim had been wearing the morning he was killed. Another photograph showed Defendant Markeil wearing the victim's watch and pants. Ms. Ruiz recognized the victim's wallet which was found in the back pocket of the pants Defendant Markeil was wearing at the time of his arrest.

On cross-examination, Ms. Ruiz acknowledged she was aware the victim sold drugs and had seen photographs of him with guns.

Jennifer Gaddis lived next door to the Ibarra family at the time of the crime, and their units shared a common wall. On September 4, 2015, she heard noises coming from the Ibarra's home that sounded like someone was breaking in and busting down doors. The noise was so loud it shook the walls of her home. Ms. Gaddis also heard what sounded like somebody falling down the stairs. She recounted hearing "a very loud bang and followed by silence, and then . . . another bang. Bang. Bang. Bang, bang, bang." She

initially did not equate the noise to gunshots but in hindsight thought she heard a total of six shots.

Ms. Gaddis said she looked out the window in the front bedroom of her home and saw a Honda Civic driving away at a high rate of speed. She took a picture of the car, believing a burglary had occurred and it might be useful. The car had a temporary tag starting with an "A." She took the photograph at 12:12 p.m. and called the police at 12:13 p.m.

Ms. Gaddis saw the same car circle the cul-de-sac and park in front of her house. The driver's side of the car was closest to her house, and Ms. Gaddis could see the driver was a woman of Hispanic or Egyptian descent with a blue half cast on her arm. She heard the driver yell, "come on, come on, come the F on, come on" in the direction of the house. Two young men exited the Ibarra's house and got into the car. She recalled they were light-skinned African-American, and one man's hair was in dreadlocks and the other in an afro. Both men were young in age, slender, and between 5'7" and 6' tall. The man with an afro was wearing red basketball shorts and a white tank top, and he was carrying a black bag. Ms. Gaddis could not recall what the man with dreadlocks was wearing other than pants and perhaps a dark color shirt. While she could not recall if this man was carrying anything, she agreed it was "[a]bsolutely" possible he had something in his hands as well. One man got in the back seat behind the driver, and the other man ran around the back of the car and got in the front passenger seat. The car then drove away at a high rate of speed.

Ms. Gaddis testified she went outside and looked down the street after the car sped off. She saw the car stop at the end of the road, and the man in the front passenger seat got out and began looking for something on the ground. The driver yelled at the man to "leave it, come on," and he got back in the car and they drove off. Ms. Gaddis confirmed there was a storm drain in the area where the car had stopped.

As the Honda Civic left the second time, Ms. Gaddis saw a gold Chrysler 300 turn into the neighborhood she recognized as belonging to someone in the Ibarra household. She then saw Joel Hernandez exit the car and go in the house. He came back out and motioned for the girl in the car, Jessica Silva, to come inside. Ms. Silva quickly ran back out, gagging. Mr. Hernandez followed her and said, "He's not breathing, I think he's dead, he's not breathing." Ms. Gaddis went back inside and called 911 a second time to report a murder.

Jessica Silva testified that the victim was her boyfriend and the father of her unborn child at the time of his murder. Around noon on that date, she and Joel Hernandez drove to the victim's house with plans to pick him up and take him to a car dealership to finalize the purchase of a vehicle. She estimated they arrived around 12:15 p.m. Ms. Silva said

she received a call from the victim's mother concerned because she was not able to get in touch with him. Ms. Silva was in the car outside the victim's house at the time but had yet to go inside.

According to Ms. Silva, Mr. Hernandez went inside to get the victim and then returned to the car, telling her something that led her to go inside. As she approached the house, she noticed the door was slightly open and the doormat was sticking out from under the door. Inside, there was water running from the ceiling, and the victim was lying face-up on the kitchen floor appearing to be dead. She put her arm underneath his neck but did not significantly move him or disturb his clothing. Mr. Hernandez called 911 at 12:22 p.m.

Ms. Silva testified she knew the defendants because they were the victim's friends. She said that Defendant Jalean went by the nickname "JJ" or "Little Rambo" and that Defendant Markeil went by the nickname "Flocka." She did not know Shirin Khwaga.

Ms. Silva examined a number of photographs and identified the victim's AK-47 assault rifle and wallet. She also identified photographs of the defendants wearing clothing and a watch belonging to the victim, including the pair of shorts and belt the victim had worn earlier that day. Ms. Silva said she shared a bedroom with the victim and was aware he sold Xanax and marijuana, which he stored in his room. She also said the victim stored his AK-47 under his bed and he additionally owned two pistols.

Joel Hernandez, a close friend of the victim, testified that Ms. Silva picked him up in her Chrysler 300 on September 4, 2015, to take him to the victim's house. He called the victim when they arrived and then walked up to the door after the victim did not answer. He noted the door was cracked open and the doormat was under the door as if someone had left in a hurry. He could also hear the sound of running water coming from inside. Mr. Hernandez knocked, rang the doorbell, and called out the victim's name but received no response. He then had Ms. Silva to call out to the victim, thinking the victim would easily recognize Ms. Silva's voice. The two entered the house and found the victim lying face-up on the floor in the kitchen. The victim was not breathing, and his pockets were turned out. There were bullet holes in the ceiling with water dripping from them.

Mr. Hernandez called 911 and then ran back inside to see if anybody was upstairs. He noticed the victim's bedroom door had been kicked in and the room ransacked. Mr. Hernandez knew the victim sold marijuana and Xanax, which he kept in Tupperware containers in his room. The victim also kept several guns in his room, including an AK-47 and nine-millimeter Glock. The guns and drugs were missing.

Mr. Hernandez spoke with the police and showed them an Instagram photograph of Defendant Markeil and a female with a blue cast in which both individuals were holding

pistols. Mr. Hernandez explained he knew the defendants, having met them through the victim, had seen them in the victim's bedroom before, and followed them both on Instagram. He knew Defendant Jalean went by the nickname "Lil Rambo," and Defendant Markeil went by the nickname "Flacka." Mr. Hernandez identified a photograph of Defendant Jalean wearing the victim's True Religion shorts and Gucci belt.

A number of officers with the Metropolitan Nashville Police Department testified regarding his or her involvement in the investigation.

Officer David Simmonds testified he was dispatched to the scene of a possible burglary at 12:18 p.m., but the investigation quickly shifted gears. Officer Simmonds detailed his observations, including the holes in the ceiling with water pouring out of them from apparent gunfire which had penetrated the water lines between the first and second floors of the home.

Officer Lynette Mace, a crime scene investigation officer, processed the scene for evidence, as well as collected DNA and lifted fingerprints. She observed an electric scale and green leafy substance believed to be marijuana in the kitchen. She determined gunfire in the victim's bedroom upstairs penetrated the floor between the levels and out an exterior wall. Altogether, Officer Mace collected three .45-millimeter cartridge casings in the kitchen and seven rifle casings in the victim's bedroom, indicating at a minimum ten shots had been fired. With the assistance of the General Services Department, a cell phone was retrieved from the storm drain down the street. Additionally, a Michael Kors watch was recovered from the back-windshield area of the unmarked patrol car used to transport Defendant Jalean into custody.

Lieutenant Charles Carter testified that the defendants and Ms. Khwaga were developed as suspects in the victim's homicide and were reported to have left the scene in a silver or light blue 2000 Honda Civic with temporary tags. Lieutenant Carter went to the last known address for Ms. Khwaga in an unmarked patrol car to surveil for the suspect vehicle. A short while later, he observed a car matching the description parked a couple houses down from Ms. Khwaga's address. A man fitting the description of Defendant Jalean was in the car. Lieutenant Carter then saw a female with a blue cast on her arm hastily approach the vehicle and throw a backpack and clothing in the trunk. The female then got into the car and drove off. Lieutenant Carter notified other officers and followed the suspect vehicle.

At some point while Lieutenant Carter tailed Ms. Khwaga, she suddenly began driving at a high rate of speed after encountering a marked patrol car. A chase ensued with three or four police cars, which ultimately ended when Ms. Khwaga's car skidded into a telephone pole. Once the car was stopped, Defendant Jalean fled on foot into nearby woods

carrying two Tupperware containers. However, he was quickly apprehended by officers. Defendant Markeil was arrested as he tried to crawl out the back seat of the car.

Detective Ian Lynch recounted his involvement in the pursuit of Ms. Khwaga's vehicle and the subsequent capture of the defendants. According to Detective Lynch, Defendant Jalean was captured after fleeing into the woods and had two Tupperware containers in his possession that contained six or seven one-ounce bags of marijuana. One or two matching bags of marijuana were found along the path of Defendant Jalean's flight. Two pistols were found on the ground under Defendant Jalean after the officers took him down. When Defendant Jalean was searched, he had just over $2700 cash in his possession. Over 100 Xanax pills in a pill bottle with no prescription on it were recovered from Ms. Khwaga's vehicle.

Officer Douglas Belcher documented the scene of the crash and collected the guns and drugs recovered by Detective Lynch. In addition, Officer Belcher collected another pistol, an "AK-47 type rifle," and a wallet from the floorboard of the wrecked car, as well as an additional pill bottle containing white pills from the woods. Officer Belcher also lifted fingerprints from the firearms and swabbed them for DNA.

Sharon Tilley, a crime lab technician, processed Ms. Khwaga's wrecked vehicle for evidence, including fingerprints and DNA. Among the items she collected in the passenger compartment of the car was a pill bottle containing Xanax, green plant material with the appearance of marijuana and marijuana cigarettes, two sets of digital scales, and two wallets. In the trunk, Ms. Tilley found a new pair of maroon True Religion pants and a Mary Kay bag containing a white sock with polka dots.

A stipulation regarding the findings of Tim Akin, a forensic chemist, was entered into evidence by the parties. Mr. Akin analyzed the green plant material, whole and broken rectangular tablets, and oblong tablets recovered in the case and determined them to be marijuana, Xanax, and Oxycodone, respectively.

Detective Derry Baltimore recounted his involvement as lead detective in the case. Detective Baltimore testified that the Ibarra home was searched with the consent of the family and that DNA samples were collected from the defendants and Ms. Khwaga pursuant to a search warrant. He also had the defendants and Ms. Khwaga photographed, fingerprinted, and tested for gunshot residue. A photographic array containing Ms. Khwaga was shown to Ms. Gaddis, and Ms. Gaddis identified Ms. Khwaga as the getaway driver. Ms. Gaddis was not asked to view photographic arrays containing either of the defendants because Ms. Gaddis had indicated she did not see the faces of the men who ran from the victim's house.

Jessica Davis, a latent print examiner, examined the fingerprints lifted from the victim's house and various guns recovered in the case and compared them with the subjects. Ms. Davis determined that the fingerprints on the Glock 30S firearm matched Defendant Jalean and that the fingerprints on the magazine of the Smith & Wesson firearm matched Defendant Markeil and Defendant Jalean.

Rachel Mack, a crime lab analyst, testified regarding her analysis of DNA evidence in the case. Of note, swabs from the trigger of the Smith & Wesson firearm returned with a profile consistent with Defendant Jalean's DNA.

Bridget Chambers, a forensic firearms examiner, testified that her analysis revealed the three spent .45 caliber cartridge casings found near the victim's body were fired from the Glock firearm found on Defendant Jalean. The seven spent 5x45 cartridge casings found in the victim's bedroom were fired from the modified AK-47 rifle found in Ms. Khwaga's car. Two .45 caliber bullets recovered from the victim's body during autopsy bore the same class characteristics as the Glock firearm found on Defendant Jalean, but Ms. Chambers could not make a conclusive determination due to "insufficient individual characteristics."

Special Agent James Russell Davis, II, a forensic scientist with the Tennessee Bureau of Investigation, analyzed the defendants' and Ms. Khwaga's gunshot residue kits. Agent Davis found the presence of gunshot residue on Defendant Markeil's kit, indicating he had fired, handled, or been near a gun when it was fired. Gunshot residue was not detected on Defendant Jalean's kit, but Agent Davis noted a negative result could also occur when residue particles are lost due to washing, time between discharge, and collection, or other routine activities.

Dr. Feng Li, the chief medical examiner for Davidson County, performed the autopsy on the victim. Dr. Li determined the cause of death was multiple gunshot wounds and manner of death was homicide. Dr. Li specified the victim sustained three gunshot wounds to the head, any of which could have been fatal, but the wound to the left temple was the most serious as it fractured the skull and injured the brain. The victim also sustained a small laceration to the forehead indicative of blunt force trauma. Dr. Li turned the bullet and bullet fragments he retrieved over to the police department for testing.

***Analysis***

I. *Sufficiency of the Evidence – Both Defendants*

The defendants both argue the evidence is insufficient to sustain their convictions because the only person to identify them as participants in the crime was an accomplice whose testimony was uncorroborated and not credible.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses'

testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

"[A] conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001). "When the only proof of a crime is the uncorroborated testimony of one or more accomplices, the evidence is insufficient to sustain a conviction as a matter of law." *State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014). Our supreme court has offered this explanation for the requirement that accomplice testimony be corroborated:

> [T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; *it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.* It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (emphasis in original). The sufficiency of the corroboration is a determination entrusted to the jury as the trier of fact. *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001).

The defendants do not contest the sufficiency of any of the elements of the offenses of which they were convicted but, instead, dispute the sufficiency of the evidence establishing their identities as perpetrators of the offenses. The identity of the perpetrator "is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). The perpetrator's identity "may be established solely on the basis of circumstantial evidence." *State v. Lewter*, 313 S.W.3d 745, 748 (Tenn. 2010).

In the light most favorable to the State, Ms. Khwaga's testimony establishes she drove the defendants to the victim's house to purchase Xanax around noon on the day of the crime. Defendant Jalean told Defendant Markeil to pretend to be asleep while

- 13 -

Defendant Jalean discussed a drug buy with the victim. Defendant Jalean then went with the victim inside his home and minutes later, Defendant Markeil followed them inside. While the men were inside, Ms. Khwaga heard four to six gunshots ring out, and she ran inside the home to investigate at which point she saw the victim's dead body on the kitchen floor. She encountered both defendants and no one else in the home.

The three of them returned to the car, and Ms. Khwaga drove away. However, the defendants insisted she drive back to the victim's house because they had "forgotten something." The defendants ran inside, while Ms. Khwaga turned her car around and pulled in front of the victim's house. When the defendants emerged, Defendant Jalean was carrying two, eight-inch plastic containers of marijuana and Defendant Markeil was carrying a gray and black rifle. Defendant Jalean told Ms. Khwaga they had to kill the victim or otherwise he would have retaliated.

Contrary to the defendants' claim, Ms. Khwaga's testimony was sufficiently corroborated by other evidence supporting the defendants' convictions. Ms. Gaddis, the next-door neighbor, testified she heard six gunshots and saw a Honda Civic with temporary tags leave the scene, only to return minutes later. Ms. Gaddis provided a description of the suspects and their clothing, which matched the clothing worn by the defendants in social media posts of them with drugs and firearms consistent with the items stolen from the victim. In addition, Ms. Ruiz, the victim's mother, Ms. Silva, the victim's girlfriend, and Mr. Hernandez, the victim's friend, provided testimony corroborating Ms. Khwaga's timeline for the incident. All three individuals also identified photographs of drugs, firearms, and/or clothing in the defendants' possession as items belonging to the victim. When Defendant Jalean fled from the police, he was carrying two plastic containers of marijuana and $2700 cash, the same amount of money Ms. Ruiz said the victim had left after putting down a $300 deposit on a car. Defendant Jalean's fingerprints were found on the presumptive murder weapon, and Defendant Markeil's hands tested positive for gunshot residue.

Moreover, the defendants' assessment of Ms. Khwaga's testimony not being credible provides no relief. It was clearly brought to the jury's attention that Ms. Khwaga had not been completely honest in her first two statements to the police but, by its verdict and in its province, the jury found her testimony at trial to be truthful. *See Pappas*, 754 S.W.2d at 623; *Grace*, 493 S.W.2d at 476.

Based on the foregoing recitation of the proof presented at trial and the applicable law, Ms. Khwaga's testimony was sufficiently corroborated. Accordingly, the evidence is sufficient to sustain the jury's verdicts, and the defendants are not entitled to relief.

- 14 -

## II. *Leading Questions – Defendant Markeil*

Defendant Markeil argues he was denied a fair trial because the State asked the victim's mother, Sarai Ibarra Ruiz, and the co-defendant, Shirin Khwaga, leading questions at the second trial. He asserts the only difference between the two trials was Ms. Khwaga's testimony, and the first trial resulted in a mistrial on the murder charges because the State did not ask her leading questions and the defense was, therefore, better able to expose inconsistencies in her testimony. Defendant Markeil acknowledges review of this issue is limited to plain error for failure to raise a contemporaneous objection at trial.

Under the plain error doctrine, a defendant may obtain relief only if all of the following criteria are satisfied: (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the issue was not waived for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016); *State v. Hester*, 324 S.W.3d 1, 56 (Tenn. 2010).

Tennessee Rule of Evidence 611 permits the use of leading questions during direct examination when "necessary to develop the witness's testimony." Tenn. R. Evid. 611(c)(1). A leading question is one that "suggests to the witness the answer desired." *Mothershed v. State*, 578 S.W.2d 96, 99 (Tenn. Crim. App. 1978), *superseded by rule on other grounds as stated in State v. Randall T. Beaty*, No. M2014-00130-CCA-R3-CD, 2015 WL 7307993 (Tenn. Crim. App. Nov. 20, 2015). However, the fact a question allows for a "yes" or "no" answer does not make the question leading. *Id.* 578. The trial judge has wide discretion in controlling leading questions, and unless the question was not only clearly leading, but also clearly prejudicial, this Court will not interfere with the action of the trial court. *Id.*

Turning first to Defendant Markeil's complaint regarding the questioning of Ms. Ruiz, we note Defendant Markeil does not provide an explanation for how the alleged leading questions asked of Ms. Ruiz were of any consequence. The record shows during the State's questioning of Ms. Ruiz, who testified through a Spanish interpreter, counsel for Defendant Jalean objected to the question, "And did you and [the victim] take the car on a test drive to where Jessica Silva was at La Hacienda Restaurant?" Defendant Jalean's counsel argued the State was leading the witness by "directly soliciting a . . . yes or no answer." The court noted a yes or no answer did not necessarily make a question leading, but Defendant Jalean's counsel maintained the witness should be able to give a narrative without being asked leading questions. The court disagreed the State's questions were leading and overruled the objection. The State proceeded by asking such questions as, "Did you try calling his girlfriend Jessica Silva," "And did you learn that she was at the house," "Once you got to work, did somebody come to you with news about what

happened," and "Did someone take you to your home?" These questions were obviously asked to facilitate and develop Ms. Ruiz's recount of the events of the morning of the victim's death and had no effect on the trial. Even if leading, Defendant Markeil has not shown the questions were clearly prejudicial and, thus, has failed to demonstrate plain error.

Turning next to Defendant Markeil's complaint regarding the questioning of Ms. Khwaga, he has likewise failed to demonstrate plain error. The record shows the litany of questions Defendant Markeil challenges were asked by the State on redirect examination, after the credibility of Ms. Khwaga's testimony was challenged on cross-examination, to clarify and summarize Ms. Khwaga's testimony on direct examination, which had not been in response to leading questions. The State was not "in the witness box" as alleged by Defendant Markeil, but instead, it was an acknowledgment by Ms. Khwaga of which facts she did or did not tell the police in her various statements to them. We discern no clear prejudice from the questions, and Defendant Markeil is not entitled to plain error relief.

*III. Consecutive Sentencing – Defendant Markeil*

The trial court conducted a sentencing hearing on the convictions in Counts 3-6, after which it imposed a sentence of two years on the possession of marijuana conviction, four years on the possession of Alprazolam conviction, and four years on each of the two possession of a firearm during the commission of a dangerous felony convictions. The court ordered all the sentences to be served consecutively for an effective term of fourteen years.

Defendant Markeil does not challenge the trial court's imposition of consecutive sentences in the typical sense, but instead, he argues the imposition of consecutive sentences for his two firearm convictions violates principles of double jeopardy. He asserts "that because the seizure of the drugs and guns were simultaneous acts and that all the drugs and guns were found in the same place . . ., that it amounted to one single course of conduct, one act as it were."

The right against double jeopardy ensures "[t]hat no person shall, for the same offense, be twice put in jeopardy of life or limb." Tenn. Const. art. I, § 10. In other words, the prohibition against double jeopardy protects criminal defendants from "multiple punishments for the same offense." *State v. Watkins*, 362 S.W.3d 530, 541 (Tenn. 2012). Our supreme court has observed "in single prosecutions, 'multiple punishment' challenges ordinarily fall into one of two categories: unit-of-prosecution claims and multiple description claims." *State v. Allison*, 618 S.W.3d 24, 43 (Tenn. 2021) (citing *Watkins*, 362 S.W.3d at 543). This case presents a unit-of-prosecution claim, which arises when a

defendant has been convicted of multiple violations of the same statute. *See Allison*, 618 S.W.3d at 43.

Somewhat recently, in *State v. Harbison*, 539 S.W.3d 149 (Tenn. 2018), our supreme court addressed a similar situation in which the defendant was convicted of three counts of employing a firearm during the commission of a dangerous felony tied to three convictions for attempted voluntary manslaughter. *Id.* at 166. The court noted the central question was whether the defendant was being subjected to multiple punishments for the same offense and then outlined the following procedure:

> The answer to this question depends on how the unit of prosecution is defined for an offense under Tennessee Code Annotated section 39-17-1324(b). To determine the unit of prosecution, we first review the statutory language for an express definition. If the unit of prosecution is clear from the statute, we apply the plain language without reviewing the legislative history. If the plain language of the statute does not identify the unit of prosecution, we determine the legislature's intent by considering the legislative history and examining the statute's subject matter, the object and reach of the statute, the wrong or evil which it seeks to remedy or prevent, and the purpose sought to be accomplished in its enactment. If there is ambiguity in defining the unit of prosecution, the rule of lenity resolves the ambiguity in favor of the defendant.

*Id.* at 168 (citations and internal quotations omitted). The *Harbison* court conducted this analysis and determined the Legislature "authorized a separate employing a firearm charge for each dangerous felony committed." *Id.* at 169.

Tennessee Code Annotated section 39-17-1324(a) provides, "It is an offense to possess a firearm or antique firearm with the intent to go armed during the commission of or attempt to commit a dangerous felony." The statute then specifies the offenses qualifying as "dangerous felonies," one of which is "[a] felony involving the sale, manufacture, distribution or possession with intent to sell, manufacture or distribute a controlled substance or controlled substance analogue defined in part 4 of this chapter[.]" *Id.* § 39-17-1324(i)(1)(L).

In this case, Defendant Markeil was convicted of possession of a firearm during the commission of two different "dangerous felonies": possession of marijuana with intent to sell or deliver, and possession of Alprazolam with intent to sell or deliver. Just because Defendant Markeil's convictions were both drug felonies arising out of the same incident, does not mean they were not two different felony convictions. His argument overlooks the clear legislative intent of allowing a separate possession of a firearm charge for each

"dangerous felony" committed, and he committed two in the instant matter.  Thus, the defendant is not entitled to relief.

### *Conclusion*

Based on the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____
J. ROSS DYER, JUDGE